**NEW YORK DOCK RAILWAY and Brooklyn Eastern District Terminal, Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**No. 61, Docket 79–4086.**

United States Court of Appeals, Second Circuit.

Argued Sept. 19, 1979.

Decided Nov. 7, 1979.

Stuart H. Johnson, Jr., Walter M. King, Jr., Washington, D. C., Christine A. Pasquariello, Brooklyn, N. Y., for petitioners.

Christine N. Kohl, Deputy Assoc. Gen. Counsel, Mark L. Evans, Gen. Counsel, I.C.C.; John E. Shenefield, Asst. Atty. Gen., John J. Powers, III, Robert Lewis Thompson, Attys., Dept. of Justice, Washington, D. C., for respondents.

William G. Mahoney, John O'B.Clarke, Jr., Highsaw, Mahoney & Friedman, P. C., Washington, D. C., for intervenor-respondent Ry. Labor Executives' Ass'n.

Harold A. Ross, Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, for intervenor-respondent Brotherhood of Locomotive Engineers.

Harry J. Breithaupt, Jr., James I. Collier, Jr., Richard T. Conway, Shea & Gardner, Washington, D. C., for amicus curiae, Ass'n of American Railroads.

Before WATERMAN, FEINBERG and TIMBERS, Circuit Judges.

WATERMAN, Circuit Judge:

Petitioners seek judicial review of an order of the Interstate Commerce Commission [1] ("ICC"), establishing as a matter of general transportation importance the labor protective conditions the challenged order imposed under section 5(2)(f) of the Interstate Commerce Act (the "I.C. Act"), as amended by section 402(a) of the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4R Act"), recently recodified as 49 U.S.C. § 11347, in railroad merger, control, consolidation, coordination and unification transactions as defined in sections 5(2) and (3) of the I.C. Act, 49 U.S.C. §§ 11343–11346. The petition for review is denied.

Before setting forth the factual situation involved in the present case and the substantive positions of the parties to this action, a brief outline of the history of railway labor protective conditions relevant to consolidations, mergers, acquisitions and other similar transactions will be detailed. Such an historical outline is able in placing the present case in context, and in describing more accurately the positions advanced by the parties in response to the ICC's imposition of the labor protective conditions here at issue.

*Historical Background*

It long ago was recognized that consolidations of railroad operations, although beneficial to the industry as a whole and to the particular carriers involved, could have devastating effects on the employees of those carriers. Accordingly, Congress in 1933 enacted the Emergency Railroad Transportation Act, which sought to protect the employees of railroads engaging in consolidation of operations by mandating a "job freeze" approach so as to guarantee the continued employment for the entire labor force of the railroads involved.

Due to the effects a "job freeze" approach to employee protection could have on operational efficiency, representatives of approximately 85% of the railroad mileage in the country agreed with 20 of the 21 national labor organizations representing railroad workers in 1936 to a form of job security arrangement that provided bargaining and compensation protection to employees but left employers free to alter the size of their work force. That agreement, the Washington Job Protection Agreement of 1936 ("WJPA"), generally is conceded to be the blueprint for all subsequent job protection arrangements.

The pertinent provisions of the Agreement, applicable to any "coordination," defined as "joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities," (§ 2(a)), were as follows:

Employees of the carriers involved in a particular coordination were entitled to various compensatory protections:

1. New York Dock Railway—Control—Brooklyn Eastern District Terminal, Finance Docket No. 28250 (February 9, 1979). The ICC's decision is attached as Exhibit A to the Petition for Review in this case.

i. any employee displaced into a lower paying position was entitled to an allowance to equalize his new rate of pay with his previous rate of pay for a period of up to five years following the effective date of the coordination (§ 6)

ii. any employee deprived of employment as a result of a coordination was entitled to receive a "coordination allowance" for a period, depending on his length of service, of up to five years following the effective date of the coordination, with the amount of the allowance equivalent to 60% of his most recent average annual compensation; in the alternative, the employee could resign and accept a "lump sum separation allowance" (§§ 7, 9)

iii. accumulated employee benefits were protected (§ 8)

iv. any employee required to change his residence as a result of the coordination was entitled to reimbursement from his employer for his moving expenses and for any loss incurred on the sale of his previous residence (§§ 10, 11)

And in addition to these compensatory protections, the WJPA also required:

v. advance notice to all employees of the affected carriers, at least 90 days prior to the effective date of the proposed coordination, this 90 day advance notice period to be used to negotiate an implementing agreement to provide for the assignment and selection of a combined work force; and the successful negotiation of such an agreement was an implicit precondition to the consummation of the proposed coordination (§§ 4, 5)[2]

vi. the submission of disputes concerning the operation of particular provisions of the WJPA, or of particular provisions of agreements reached pursuant to the terms of the WJPA, to a process of resolution employing binding arbitration (§§ 11, 13).

A few years later, in a proceeding concerning the approval of a lease of railroad property, *Chicago, R. I. & G. Ry. Trustees Lease*, 230 I.C.C. 181 (1938), *modified*, 233 I.C.C. 21 (1939), the ICC prescribed employee protective conditions similar to those found in the WJPA, although there was no specific statutory language authorizing this action; and in *United States v. Lowden*, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939), the Supreme Court upheld the imposition of these labor protective conditions, finding such action to be within the ICC's authority pursuant to its mandate to act in the "public interest."

Soon after this decision, in the Transportation Act of 1940, Congress enacted various amendments to the I.C. Act, including the original labor protective provisions contained in section 5(2)(f), 49 U.S.C. § 5(2)(f), which provided as follows:

As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the

**2.** In a subsequent case discussing the purposes and operation of sections 4 and 5 of the WJPA, the ICC concluded that

The inclusion of provisions of the type contained in sections 4 and 5 of the [WJPA] was required, in our opinion, in order to provide the employees the protection to which they were entitled under the statute. . . .

The inclusion of conditions insuring the right of the employees here involved to notice and the negotiation of implementing agreements were indispensable prerequisites in effectuating a valid order of approval in the proceeding.
Southern Ry.-Control-Central of Ga. Ry., 331 I.C.C. 151, 166 (1967).

employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees.

Later, in a subsequent case involving both a carrier abandonment and purchase application, *Oklahoma Ry. Trustees-Abandonment of Operations*, 257 I.C.C. 177 (1944), the ICC developed, pursuant to the statutory authority granted in section 5(2)(f) of the I.C. Act, the so-called "Oklahoma conditions." These conditions essentially paralleled the provisions of the WJPA, with two principal exceptions: (i) the maximum prescribed protective period was four years following the effective date of the ICC's order, as contrasted to the five years following the effective date of the coordination provided in the WJPA; and (ii) there were no express provisions dealing with required advance notice to affected employees, nor with the prior negotiation of an agreement concerning the reassignment of employees.

As a result of these exceptions, an employees' union challenged the ICC's imposition of the standard "Oklahoma conditions" in *New Orleans Union Passenger Terminal Case*, 267 I.C.C. 763 (1948). In its review of the ICC's decision in that case, the Supreme Court, after examining the legislative history of section 5(2)(f), concluded that the explicit reference to a four year period in the second sentence of that section was intended to establish the minimum period of protection only, and should not have been construed as also setting the statutory maximum period. Consequently, the Court reversed the ICC's decision and remanded the case to the ICC for further consideration. *Railway Labor Executives' Ass'n v. United States*, 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721 (1950). Upon its reconsideration of the case, the ICC then devised the so-called "New Orleans conditions." Essentially, these conditions consisted of the "Oklahoma

conditions" supplemented by the additional protections afforded by the WJPA. *New Orleans Union Passenger Terminal Case*, 282 I.C.C. 271 (1952).

Nearly 10 years later, the U. S. Supreme Court rejected the contention of an employees' union that the "New Orleans conditions" provided inadequate employee protection and should be supplemented by modified "job freeze" provisions. The Court concluded that the clear intent of section 5(2)(f) was to provide affected employees with compensation, not guaranteed jobs. *Brotherhood of Maintenance of Way Employes v. United States*, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961). The next year, labor again renewed its request for "job freeze" protective provisions. The ICC rejected this new request, and, in doing so, set forth the "New Orleans conditions" as the standard of employee protection. *Southern Ry.-Control-Central of Ga. Ry.*, 317 I.C.C. 557 (1962), *modified*, 317 I.C.C. 729 (1963) [*Southern Control I*]. However, the ICC's decision did not explicitly set out as components of the standard "New Orleans conditions" the prior notice and negotiation and the mandatory arbitration provisions which were contained in §§ 4 and 5 of the WJPA. Hence, because of the uncertainty surrounding this matter, the case reached the Supreme Court on review. The Court, *Railway Labor Executives' Ass'n v. United States*, 379 U.S. 199, 85 S.Ct. 307, 13 L.Ed.2d 338 (1964), chose to remand the case to the ICC for clarification of the conditions it had intended to impose in its *Southern Control I* decision. On remand, the ICC declared its intent to include in the "New Orleans conditions" all of the substantive protections provided under the WJPA, including the prior notice and negotiation and mandatory arbitration provisions found in §§ 4 and 5. *Southern Ry.-Control-Central of Ga. Ry.*, 331 I.C.C. 151 (1967) [*Southern Control II*].

Then, more recently, in the course of laying the foundation for a national rail passenger system, Congress enacted the Rail Passenger Service Act of 1970 (the "Amtrak Act"). Section 405 of that stat-

ute, codified as 45 U.S.C. § 565, provides as follows:

(a) A railroad shall provide fair and equitable arrangements to protect the interests of employees, including employees of terminal companies, affected by a discontinuance of intercity rail passenger service . . .. A "discontinuance of intercity rail passenger service" shall include any discontinuance of service performed by railroad under any facility or service agreement under sections 545 and 562 of this title pursuant to any modification or termination thereof or an assumption of operations by the Corporation [Amtrak].

(b) Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) to such employees under existing collective-bargaining agreements or otherwise; (2) the continuation of collective-bargaining rights; (3) the protection of such individual employees against a worsening of their positions with respect to their employment; (4) assurances of priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of [the Interstate Commerce Act.] Any contract entered into pursuant to the provisions of this subchapter shall specify the terms and conditions of such protective arrangements. No contract under section 561(a)(1) of this title between a railroad and [Amtrak] may be made unless the Secretary of Labor has certified to [Amtrak] that the labor protective provisions of such contract afford affected employees, including affected terminal employees, fair and equitable protection by the railroad.

Shortly thereafter, in 1971, pursuant to the statutory authority contained in the above quoted section 405 of the Amtrak Act, Secretary of Labor Hodgson certified a labor protective arrangement that became known as "Appendix C–1." Appendix C–1 basically adopted the core benefits originally provided under the WJPA. However, Appendix C–1 differed materially from the WJPA in several respects: (i) the benefits provided under Appendix C–1 are not static, but may be adjusted upward as wages increase (Art. I, § 5(a)); (ii) the protective period is increased to six years from the date an employee actually is dismissed or displaced from his former position as a result of the discontinuance of his employer's rail passenger service (Art. I, § 1(d)), and such employees are eligible for priority as to reemployment and for paid retraining rights (Art. II, §§ 1 & 2); (iii) all protective benefits are extended to employees of separately incorporated terminal companies who are affected by the transaction (Art. III); and (iv) the prior notice and negotiation and the mandatory arbitration provisions are modified so that only 20 days advance notice is required, and the railroads involved are authorized expressly to proceed with the transaction before any agreement concerning the selection and assignment of a work force is reached (Art. I, § 4). Also, there is a provision that specifically prohibits "duplication or pyramiding of benefits" (Art. I, § 3). And, finally, there is a provision specifying the allocation of the burden of proof between the respective parties in dispute arising under these labor protective provisions, which provision first requires the employee to identify the transaction and indicate the factors he relies upon to support his claim of entitlement to benefits, whereupon the burden shifts to his employer who must prove that factors other than those the employee indicated are actually responsible for any adverse effects to the employee (Art. I, § 11(e)).

In 1971, the District Court for the District of Columbia rejected the contention of various labor unions that the certification of the Appendix C–1 conditions by the Secretary of Labor was invalid for having failed to satisfy the minimum requirements

of section 405 of the Amtrak Act. *Congress of Railway Unions v. Hodgson,* 326 F.Supp. 68 (D.D.C.1971). The district court, although holding as an initial matter that the Secretary's certification was an unreviewable agency action committed to his sole discretion, proceeded to assume reviewability and found that the protective conditions "not only meet the requirements of Section 405 of the [Amtrak] Act and of Section 5(2)(f) of the Interstate Commerce Act but they in fact exceed these requirements in significant respects." *Id.* at 76 (footnote omitted).

Lastly, in 1976, Congress substantially revised Part I of the I.C. Act when it adopted the 4R Act. By section 402(a) of the 4R Act, Congress amended section 5(2)(f) of the I.C. Act, then codified at 49 U.S.C. § 5(2)(f), as follows (new material italicized):

As a condition of its approval, under this paragraph [(2)] or paragraph (3), of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. *Such arrangement shall contain provi-*

*sions no less protective of the interests of employees than those heretofore imposed pursuant to this subdivision and those established pursuant to section 565 of Title 45 [section 405 of the Rail Passenger Service Act].* Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees.

This amendment to section 5(2)(f) of the I.C. Act, effected by section 402(a) of the 4R Act, provided the impetus for the ICC to adopt the newer and more beneficial labor protective arrangement at issue in the present case.[3] These labor protective provisions, hereinafter referred to as the "New York Dock conditions," comprise the subject matter of this petition for review.

*Factual Summary*

Petitioners, New York Dock Railway ("NYD") and Brooklyn Eastern District Terminal ("BEDT"), are two small Class III terminal railways, each engaging in rail-marine operations in the New York City harbor zone. To carry out a plan to consolidate these two operations, NYD sought approval from the ICC pursuant to 49 U.S.C. §§ 11343–11346 (sections 5(2) and (3) of the I.C. Act) to acquire control of BEDT through a tender offer for BEDT stock, and to issue additional NYD securities for that purpose.

After holding oral hearings on the matter, Administrative Law Judge Robert M. Glennon, by an Initial Decision dated May 13, 1977, approved NYD's application to acquire control of BEDT and granted NYD authority to issue securities for that pur-

---

**3.** Since the inception of this litigation, Congress has recodified 49 U.S.C. § 5(2)(f) as 49 U.S.C. § 11347. Although this recent recodification involved an almost total rewording of "old" § 5(2)(f), Congress did not intend to effect any substantive changes. Moreover, the language that § 402(a) of the 4R Act added to "old"

§ 5(2)(f) has been carried forward largely intact. Therefore, for purposes of simplicity, this opinion will employ the language of 49 U.S.C. § 5(2)(f) as it appeared *prior to* its recodification as 49 U.S.C. § 11347 in all subsequent discussions pertaining to either 49 U.S.C. § 5(2)(f) or 49 U.S.C. § 11347.

pose.[4] However, as a condition of this approval, certain labor protective provisions were imposed. These consisted of the "New Orleans conditions" (as clarified in *Southern Control II—i. e.,* including the 90 day advance notice and negotiation and the mandatory arbitration provisions contained in §§ 4 and 5 of the WJPA) augmented by various components of the Appendix C–1 conditions (specifically, the extension of the protective period to six years, and the allocation of burden of proof between the parties).

Upon the parties' filing of exceptions to the ALJ's decision, Division 3 of the ICC, by an Order dated September 26, 1977, approved and adopted the ALJ's Initial Decision, except that the Appendix C–1 conditions were substituted for those that originally had been imposed by the ALJ. Intervenor-respondent Railway Labor Executives' Association ("RLEA") petitioned for a stay of this decision. By a further Order dated September 29, 1977, Division 3 of the ICC denied RLEA's request for a stay to permit NYD and BEDT to consummate the tender offer (NYD has acquired 92% of BEDT's capital stock pursuant to this tender offer), but prohibited NYD and BEDT from taking any action that would affect employees' rights, pending further ICC review of the protective conditions imposed.

On April 11, 1978, Division 3 of the ICC, acting as an appellate division, reviewed the entire record and rendered its decision in this case, once again approving the acquisition of control of BEDT by NYD and further modifying the labor protective provisions that were required to be imposed.[5] Essentially, the net effect of these modifications to the set of labor protective conditions returned matters full circle to the labor protective conditions originally imposed by the ALJ. However, due to the fact that some of the parties had acted in reliance on prior agency pronouncements in this case, the Division's order did not require strict compliance with the advance notice and negotiation provisions.

Throughout these proceedings, RLEA had had a petition on file with the ICC seeking a determination that the proceeding involved a matter of "general transportation importance" such that review by the full ICC was warranted. Upon the issuance of Division 3's final decision in this case, RLEA renewed its petition, which the ICC granted by a decision dated July 17, 1978.

The ICC thus reopened the case for further consideration, and, in a unanimous [6] decision dated February 9, 1979, formulated a definitive set of employee protective conditions, which it conceived to be "commensurate with our statutory [49 U.S.C. § 11347] obligation." [7] Briefly, the ICC, in formulating the "New York Dock conditions" selected the most favorable of the labor protective provisions contained in both the "New Orleans conditions" (as clarified in *Southern Control II*) and the Appendix C–1 conditions. In addition, the ICC made certain modifications to the definitions of several key terms, thereby delineating more precisely the extent and nature of the intended coverage of the "New York Dock conditions."

*Introduction*

█ In overall effect, the "New York Dock conditions" can be fairly characterized as significantly more protective of the interests of railway labor than any previously imposed single set of employee protective conditions. Of course, it is beyond challenge that within its discretion the ICC may fashion employee protective conditions that

---

**4.** New York Dock Railway-Control-Brooklyn Eastern District Terminal, Finance Docket No. 28250 (May 13, 1977). The ALJ's Initial Decision is attached as Exhibit B to the Petition for Review in this case.

**5.** New York Dock Railway-Control-Brooklyn Eastern District Terminal, 354 I.C.C. 399 (1978).

**6.** Vice Chairman Brown was absent and did not participate; Commissioner Graham concurred in the result only.

**7.** *New York Dock Railway, supra* note 1, at 16.

are tailored to the special circumstances present in individual cases. Moreover, in fulfilling its statutory duty to "require a fair and equitable arrangement" to protect employee interests in certain types of rail carrier transactions, the case law clearly establishes that the ICC has the discretion to require a greater degree of employee protection than that required as the statutory minimum. *See Railway Labor Executives' Ass'n v. United States,* 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721 (1950).[8]

Nevertheless, for several reasons, we do not believe that the ICC was exercising this type of discretion in formulating the employee protective conditions at issue here. For example, the ICC readily acknowledges the possibility that several of the provisions contained in the "New York Dock conditions" may have no application to the particular factual situation presented by the transaction involving NYD and BEDT. In explaining the inclusion of these provisions the ICC asserts that the presence of such seemingly irrelevant provisions is at least

partially attributable to a conscious decision to employ this case as a vehicle for the formulation of a new set of employee protective conditions of general applicability.[9] In addition, language in the ICC's decision suggests that it regarded the formulation of the "New York Dock conditions" to be required in order to satisfy the statutory minimum degree of employee protection mandated by 49 U.S.C. § 11347.[10] Accordingly, we will assume, for purposes of our review of that decision, that the ICC intended the "New York Dock conditions" to satisfy only the baseline level of employee protection mandated by 49 U.S.C. § 11347.

We now turn to a discussion of the merits of the conflicting positions of the parties. We point out at once that all the parties to this proceeding are in substantial agreement in two important particulars. All parties appear willing to concede that when amended section 5(2)(f) of the I.C. Act speaks of "[those] provisions . . . heretofore imposed pursuant to this subdivi-

---

**8.** However, when an agency chooses to exercise such discretion, rather than adhering to the precise statutory mandate, the case law also clearly establishes that the agency "must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.'" *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) (quoting *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed.2d 1271 (1941)). Moreover, when an agency chooses to exercise such discretion, it "must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines, supra,* 371 U.S. at 168, 83 S.Ct. at 245 (citations omitted). In light of our assumption that the ICC did not exercise such discretion in formulating the "New York Dock conditions," *see* text at footnotes 9 and 10, *infra,* we of course express no opinion as to whether the ICC's decision contains those elements required under *Burlington Truck Lines* to sustain the imposition of the "New York Dock conditions" as an exercise of agency discretion.

**9.** The ICC's decision characterized the "New York Dock conditions" as "appropriate for imposition in this proceeding as well as [in] other proceedings involving rail carriers arising under 49 U.S.C. § 11343 *et seq.* . . ." *New York Dock Railway, supra* note 1, at 25. The ICC further noted that "[w]hile each labor pro-

tective provision may not be invoked in the situation arising from the transaction approved here (i. e., provisions regarding moving expenses, etc.), there is ample evidence of record upon which to base a determination of the appropriate conditions to be applied in the usual case." *Id.* at 15. Certainly, if, pursuant to its authority to respond to the peculiarities of a specific rail carrier transaction, the ICC had intended to exercise its discretion by formulating the "New York Dock conditions" as a special set of employee protective conditions, it would have realized that it would be most inappropriate to extend such a special set of employee protective conditions to a wide range of factually dissimilar rail carrier transactions in the future.

**10.** At various points in its decision, the ICC stated: that it was "concerned here with the level of labor protective conditions required by 49 U.S.C. § 11347" *New York Dock Railway, supra* note 1, at 15; that "the level of protection developed here and set forth in Appendix III to this decision represents a fair arrangement meeting the minimum requirements of 49 U.S.C. § 11347" *id.* at 25; that in deciding as it did the Commission "reaffirmed our general conclusions as to this minimum level of protection" *id.* at 16 (footnote omitted); and, finally, that "here we are only establishing a fair, yet minimum, level of protection to be applied in certain proceedings." *Id.* at 25. *See also* text at note 7, *supra.*

sion" the intended reference is to the "New Orleans conditions" (as clarified in *Southern Control II*). All parties also appear to agree that the amendment to section 5(2)(f) of the I.C. Act by section 402(a) of the 4R Act was intended to require that some level of employee protection, in addition to the level provided by the standard "New Orleans conditions," should be imposed in subsequent rail carrier transactions subject to sections 5(2) and (3) of the I.C. Act, recently recodified as 49 U.S.C. §§ 11343–11346.

The parties disagree over the correct interpretation of the phrase "those [provisions] established pursuant to section 565 of Title 45 [section 405 of the Rail Passenger Service [Amtrak] Act]." Petitioners NYD and BEDT, as well as amicus curiae, Association of American Railroads ("AAR"), insist that the unambiguous intent of this passage only requires that any set of employee protective conditions adopted pursuant to 49 U.S.C. § 11347 explicitly address each of the five factors enumerated in section 405(b) of the Amtrak Act. Consequently, they allege that the ICC seriously misconstrued the statutory mandate of 49 U.S.C. § 11347, and incorrectly imposed employee protective provisions that are far in excess of the minimum required by statute. Respondent ICC, on the other hand, maintains that this passage is an unambiguous command to incorporate the Appendix C–1 conditions into

any set of employee protective conditions imposed pursuant to 49 U.S.C. § 11347. Accordingly, the ICC contends that its formulation of the "New York Dock conditions" comports precisely with the statutory mandate. Based upon our understanding of the "New York Dock conditions," an understanding we explain hereafter, we agree with the position taken by the ICC.

As noted above, both sides in this case are confident that the express language of the involved statute provides unambiguous support for their respective positions. The parties, however, apparently recognizing that this may not be the typical case where there is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes," *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940), have attempted to resort to the legislative history of the 4R Act to bolster their positions. Unfortunately, section 402(a) of the 4R Act, the source of the eventual amendment to section 5(2)(f) of the I.C. Act, was a last-minute addition, appearing only in the final version of the 4R Act. Consequently, there is no legislative history that deals specifically with this particular section.[11] Thus we must move beyond an examination of the statutory language and legislative history.[12]

---

11. We do, however, find the legislative history concerning the general treatment of labor protective arrangements in the 4R Act advanced by intervenor respondent RLEA in support of the ICC's position to be more persuasive than the legislative history concerning a similar passage of the 4R Act advanced by amicus AAR in support of the petitioners' position. Nevertheless, our holding is not based solely on an examination of the language of section 402(a) of the 4R Act and the Act's legislative history.

12. Indeed, the only evidence of congressional intent relative to the meaning of amended section 5(2)(f) that petitioners advance is contained in an earlier decision of the ICC, which also dealt with a related question concerning the meaning of the language added to section 5(2)(f) by section 402(a) of the 4R Act. *Missouri P. R. R.-Merger-Texas & P. Ry. and Chicago & E. Ill. R. R.*, 348 I.C.A. 414 (1976) ["*Mo-Pac Merger*"], *rev'd in part on other grounds sub nom. City of Palestine v. United States*, 559 F.2d 408 (5th Cir. 1977), *cert. de-*

nied, 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978).

Petitioners place great reliance on the following statement, which appears in the ICC's opinion in that case: "Congress did not intend to have the Commission significantly change its policy in this area." *Mo-Pac Merger, supra,* 348 I.C.C. at 427. Although facially supportive of petitioners' contention that the amendment to section 5(2)(f) of the I.C. Act was not intended to produce any dramatic changes in the substance of the employee protective conditions imposed pursuant to that section, an examination of the context in which this statement was made undercuts any inference favorable to petitioners. In the relevant portion of its *Mo-Pac Merger* opinion, the ICC was addressing the argument of various labor groups that the amendment to section 5(2)(f) of the I.C. Act indicated Congress's belief that compensatory protective provisions were insufficient, and that future labor protective arrangements imposed under that section should con-

In so doing, we perceive the most telling evidence against the correctness of petitioners' interpretation of amended section 5(2)(f) of the I.C. Act to be the inherent inconsistency in the argument they advance in support of their position. Petitioners concede that when amended section 5(2)(f) mentions "[those] provisions . . . heretofore imposed pursuant to [section 5(2)(f) of the I.C. Act]," it is referring to the "New Orleans conditions" (presumably, although petitioners do not so state, as clarified in *Southern Control II*). However, petitioners contend that when amended section 5(2)(f) mentions "those [provisions] established pursuant to section 565 of Title 45 [section 405 of the Amtrak Act]," it is referring only to the statutory minima explicitly set forth in section 405(b) of the Amtrak Act. Thus, petitioners would have us believe that these two passages, employing nearly identical language, are intended to have two very different meanings, one permitting reference to provisions promulgated pursuant to the authority of section 5(2)(f) of the I.C. Act, and the other forbidding reference to anything beyond the express statutory language of section 405(b) of the Amtrak Act. Such a curious construction of the amendment to section 5(2)(f) of the I.C.Act effected by section 402(a) of the 4R Act is untenable for several reasons.

Most importantly, the very language of section 405(b) of the Amtrak Act refutes such a construction. Indeed, that section begins by stating that "[s]uch protective arrangements shall include, *without being limited to*, [the five factors subsequently enumerated]." Therefore, it is clear that even the express statutory language which petitioners rely upon would require (or, at least, permit the imposition of) employee protective provisions in addition to the five factors specifically enumerated to meet the statutory minima.

Accordingly, in light of the language of the statute, a survey of the legislative history, and the inconsistencies that attach to petitioners' interpretation, we agree with the ICC's interpretation of amended section 5(2)(f) of the I.C. Act, namely that "[those] provisions . . . heretofore imposed pursuant to [section 5(2)(f) of the I.C. Act]" means the "New Orleans conditions" (as clarified in *Southern Control II*), and that "those [provisions] established pursuant to section 565 of Title 45 [section 405 of the Amtrak Act]" means the Appendix C–1 conditions. Accepting this interpretation of the relevant statute, the bulk of petitioners' challenges to the ICC's decision in this case can be disposed of rather succinctly.

As so interpreted, the plain language of 49 U.S.C. § 11347 requires that the ICC, in formulating a new set of employee protective conditions, combine those benefits provided under both the "New Orleans conditions" (as clarified in *Southern Control II*) and the Appendix C–1 conditions. Obviously, where conflicting benefits are provided under each of the two sets, the ICC is to select the more beneficial of the two for inclusion in the new set. Accordingly, the imposition of any employee protective provision which can be traced directly to either the "New Orleans conditions" (as clarified in *Southern Control II*) or the Appendix C–1 conditions clearly should be unobjectionable as embodying the minimum degree of protection contemplated by 49 U.S.C. § 11347. Such provisions include: the 90 day advance notice requirement (Art. I, § 4(a)), the requirement of an implementation agreement as a precondition to the initiation of any action directed toward the consummation of a proposed transaction (Art. I, § 4(b)), and the binding arbitration requirements (Art. I, § 11), all of which are drawn from related provisions contained in the "New Orleans conditions" (as clarified

---

tain some sort of "job freeze" provisions as well. Because the ICC's statement was made in refuting that argument, it seems clear that the "policy" spoken of refers to a compensation based approach to labor protection rather than to a job freeze approach, and does not

refer to the particular elements comprising the compensation based approach. Furthermore, the ICC's opinion in this case, *New York Dock Railway, supra* note 1, at 16 n. 13, indicates that this was the meaning its prior statement in *Mo-Pac Merger* was intended to convey.

in *Southern Control II* );[13] and the extension of the protective period to six years (Art. I, § 1(d)) together with the express allocation of the burden of proof between the parties (Art. I, § 11(e)) both of which are drawn directly from identical provisions contained in the Appendix C–1 conditions.[14]

 Before next proceeding to discuss petitioners' remaining challenges to other provisions contained in the "New York Dock conditions," we shall treat briefly their arguments that all provisions contained in the "New York Dock conditions" that are not applicable to the present transaction should be stricken from the ICC's decision. Petitioners contend that because the present transaction is purely local in nature, certain provisions contained in the "New York Dock conditions" (*e. g.*, the provisions requiring employer reimbursement for the moving expenses and losses on sales of homes incurred by employees as a result of the transaction) are irrelevant, and consequently should not have been imposed. Although petitioners' premise may or may not be correct, we do not agree with their conclusion. First, if as claimed, these provisions have no application to the present transaction, they cannot result in any adverse consequences to NYD or BEDT. For, as surplusage, these parties have no grounds for complaint about their inclusion. Second, the ICC explicitly recognized that in selecting this case as a vehicle for the formulation of a new set of generally applicable protective conditions, certain provisions of necessity would be included that would have no particular relevance to the fact situation presented by the NYD/BEDT transaction.[15] Finally, as counsel for RLEA noted at oral argument, the harm suffered by petitioners as a result of being subject to seemingly irrelevant provisions is far outweighed by the harm that would be suffered by affected employees if these provisions were to be deleted and the events which they are designed to protect against were, by some presently unexpected circumstance, actually to occur.

 The definitional provisions contained in the "New York Dock conditions" remain to be discussed. Petitioners' objections to the ICC's definition of the term "transaction" are without merit.[16] Although this definition has no precise ancestor in either the "New Orleans conditions" (as clarified in *Southern Control II* ) or in the Appendix C–1 conditions, it is clear from the definition itself, as well as from the ICC's expressed intention in formulating this definition, that the goal which the ICC had in mind was to encompass in its definition of "transaction" the same situations that were within the parallel term "coordination" employed in the admitted blueprint for all current employee protective packages, the WJPA. We do not believe that this goal is beyond the statutory authority conferred on the ICC in formulating employee protective conditions pursuant to 49 U.S.C. § 11347. Nor do we believe that the ICC's attempt to achieve this goal strays so far from the mark that the term "transaction" needs any redefinition by us.

Petitioners' objections to the ICC's rephrasing of the prohibition against duplication or pyramiding of benefits, an essential element of the original Appendix C–1 conditions, do, however, appear to raise some serious difficulties. In the ALJ's Initial Decision in this case, the provision from Appendix C–1 that prohibits duplication or

---

13. As previously noted, the ICC, in *Southern Control II*, clarified its intention that the "New Orleans conditions" contain all the substantive protections afforded by the WJPA. Thus, the 90 day advance notice requirement can be traced through the "New Orleans conditions" directly to § 4 of the WJPA; the requirement of an implementation agreement to language in § 5 of the WJPA and language in the ICC's opinion in *Southern Control II* (*see* note 2, *supra* ); and the binding arbitration requirements to §§ 5 and 13 of the WJPA.

14. The six year protective period is drawn directly from Art. I, § 1(d) of Appendix C–1, and the burden of proof allocation is drawn directly from Art. I, § 11(e) of Appendix C–1.

15. *See* note 9 *supra*.

16. Article I, § 1(a) of the "New York Dock conditions" defines the term "transaction" as "any action taken pursuant to authorizations by the Commission on which these provisions have been imposed."

pyramiding of benefits was adopted verbatim.[17] Upon its review of the ALJ's decision, the ICC, after analyzing the wording, history and subsequent interpretations of this provision, concluded that a rephrasing was necessary. Accordingly, in the ICC's final decision, the following language is intended to carry forward the original intent of the prohibition against duplication or pyramiding of benefits first contained in the Appendix C–1 conditions:

> Nothing in this Appendix shall be construed as depriving any employee of any rights or benefits or eliminating any obligations which such employee may have under any existing job security or other protective conditions or arrangements; *provided*, that if an employee otherwise is eligible for protection under both this Appendix and some other job security or other protective conditions or arrangements, he shall elect between the benefits under this Appendix and similar benefits under such other arrangement and, for so long as he continues to receive such benefits under the provisions which he so elects, he shall not be entitled to the same type of benefit under the provisions which he does not so elect; *provided further,* that the benefits under this Appendix, or any other arrangement, shall be construed to include the conditions, responsibilities and obligations accompanying such benefits; and, *provided further,* that after expiration of the period for which such employee is entitled to protection under the arrangement which he so elects, he may then be entitled to protection under the other arrangement for the remainder, if any, of this protective period under that arrangement.[18]

The ICC went on to explain that

> Both RLEA and BLE express concern over the interpretation of Article I, sec-

tion 3 as it is now written [*i. e.,* as a verbatim copy of Art. I, § 3 of Appendix C–1]. We agree that a fair and equitable arrangement usually should not require a complete forfeiture of other existing labor protective conditions. Because the section as now written has been interpreted in such a manner, we feel it is necessary to rephrase the condition so as to preclude the possibility of such a reading. Our study of the provision . . . indicates that it preserves existing protections yet with the required prohibitions against duplication of benefits (see the first proviso) and against pyramiding (see the latter portion of the final proviso). We will adopt the proposed provision as we feel it is an appropriate clarification of the intent of [the original provision prohibiting pyramiding and duplication of benefits contained in Appendix C–1].[19]

We have no doubt that the language adopted by the ICC preserves intact the original intent underlying Appendix C–1's prohibition against duplication of benefits. Surely the plain meaning of the first proviso is that an employee who is covered by more than one set of protective conditions cannot receive the same type of benefit under each plan at the same time (*e. g.,* an employee covered by wage protective provisions contained in a collective bargaining agreement, and also covered by the wage protective provisions contained in the "New York Dock conditions," could not receive two compensatory payments for lost wages in the same period, but would have to choose between the compensatory payment provided under one plan and the compensatory payment provided under the other).

---

**17.** This provision was contained in Appendix C–1 as Art. I, § 3, and read as follows:

> Nothing in this Appendix shall be construed as depriving any employee of any rights or benefits or eliminating any obligations which such employee may have under any existing job security or other protective conditions or arrangements; provided, that there shall be no duplication or pyramiding of benefits to any employees, and, provided

further, that the benefits under this Appendix, or any other arrangement, shall be construed to include the conditions, responsibilities and obligations accompanying such benefits.

**18.** *New York Dock Railway, supra* note 1, Appendix III at 1–2.

**19.** *Id.* at 21–22.

The language employed by the ICC in the first proviso appears both to capture the concept of duplication of benefits and to prohibit it effectively.

Unfortunately, the language employed by the ICC in the final proviso's latter portion, which is intended to carry forward the prohibition against pyramiding of benefits, is capable of several interpretations, not all of which we believe to be consistent with the intent underlying the original prohibition against pyramiding of benefits contained in Appendix C–1. At this point, therefore, it may be helpful to survey the history of this Appendix C–1 provision and to examine subsequent interpretations of its language in an attempt to discover the ICC's purpose in rephrasing this prohibition.

In its original form as part of Article I, § 3 of Appendix C–1, this provision rather tersely stated that "there shall be no duplication or pyramiding of benefits to any employees." Not until litigation commenced over the sufficiency of the Appendix C–1 conditions was an explanation of the purposes and intended effects of these prohibitions offered. In that litigation, *Congress of Railway Unions v. Hodgson*, 326 F.Supp. 68 (D.D.C.1971), Secretary of Labor Hodgson submitted an affidavit detailing his intentions in certifying the Appendix C–1 conditions. The following portion of that affidavit relates to the provisions prohibiting duplication or pyramiding of benefits.

> Plaintiffs raise a question concerning the proviso to section 3, alleging it would deprive employees of benefits governed by other protective agreements.
>
> On the contrary section 3 specifically preserves the rights of an employee under other protective arrangements, although it does prohibit the pyramiding and duplication of benefits. The proviso simply recognizes that there may be certain obligations related to a particular benefit which an employee may not ig-

nore if he chooses to take advantage of that benefit as opposed to another contained in a different protective agreement. Thus, each benefit carries with it the obligations which accompany that benefit. No other requirement could be deemed "fair and equitable."

As is apparent, Secretary Hodgson's explanation does little to clarify the types of situations that the prohibition against pyramiding of benefits is intended to encompass.

The most definitive pronouncement on the meaning of the prohibition against duplication or pyramiding of benefits is not contained in any agency communication but in an arbitration award handed down by a three-man split arbitration panel.[20] The so-called "Weston award," named after the neutral swing member of the arbitration panel, placed the following interpretation on the prohibitions against duplication or pyramiding of benefits contained in Appendix C–1:

> 1. The provisions of Article I Section 3 of Appendix C–1 require an employe [sic] who is covered by [the set of employee protective conditions contained in a collective bargaining agreement involved in the case], and who is affected by the discontinuance of intercity rail passenger service to elect either all of the benefits and obligations of Appendix C–1 or all of the benefits and obligations of [the employee protective conditions contained in the collective bargaining agreement].

Thus, the "Weston award" interprets the prohibition against duplication or pyramiding of benefits contained in Appendix C–1 to require an employee to elect an all or nothing choice: an employee covered by two sets of employee protective conditions must choose to accept all of one set or all of the other set, and, in so choosing, is precluded from ever receiving any of the benefits contained in the set not chosen.

The third member of the arbitration panel found this interpretation of the prohibi-

---

**20.** The arbitration proceeding was instituted to resolve a dispute between Penn Central Transportation Co. and the Brotherhood of Railway, Airline and Steamship Clerks. A copy of the arbitration panel's opinions and award is attached as Exhibit D to the Brief for Petitioners NYD and BEDT.

tions against duplication or pyramiding of benefits to be wholly unsupported by either the language of Appendix C–1 or the expressed intent of Secretary Hodgson, and detailed his objections to the award in a "vigorous" dissent. The basic position advanced in this dissent, and amply supported by citations to testimony given by Secretary Hodgson before Congress, is that the prohibitions against duplication or pyramiding of benefits were not intended to supersede the provisions of other existing employee protective arrangements that might be involved in particular cases.[21]

We think it a fair characterization that the ICC's principal purpose in rephrasing the prohibition against pyramiding of benefits was to circumvent the unnecessarily harsh "all or nothing" interpretation of that prohibition contained in the "Weston award," and that the ICC's position on this issue basically parallels the approach taken by the dissenting member of the arbitration panel. However, in its rephrasing the ICC uses language that is interpretable as completely nullifying any real substance in the prohibition against pyramiding.

The common understanding of the term "pyramiding" calls to mind a process in which things are stacked or piled, one on top of the other. We have not uncovered, nor has the ICC brought to our attention, any evidence indicating that the term "pyramiding," as employed in Appendix C–1, is intended to convey a meaning different from this one suggested by common understanding.[22] Nevertheless, language in the

---

21. The dissenting member's opinion reproduces the following portions of Secretary Hodgson's testimony given on April 28, 1971 before the U. S. House of Representatives Committee on Interstate and Foreign Commerce, Subcommittee on Transportation and Aeronautics:

> Mr. Metcalfe. There are some carriers who have an arrangement worked out between management and labor in which they give protection for life. . . . [H]ow do you respect the arrangements that some of these carriers have made on the attritional basis that already are in existence? Do you recognize them or does your order supersede them?
> Secretary Hodgson. It does not supersede them, those arrangements and agreements remain in effect.

> . . . . .

> Mr. Dingell. . . . On Section 3, Article I, the conditions you certified included language which said as follows: "Provided further, that the benefits under this or any other arrangement shall be construed to include [the] conditions, responsibilities and obligations accompanying such benefits."
> Does this mean, for example, that your certified arrangements supersedes [sic] in any fashion existing protective agreements?
> Secretary Hodgson. This does not supersede either protective agreements or collective bargaining agreements of any kind.

While Secretary Hodgson's testimony clearly indicates that the Appendix C–1 conditions were not intended to supersede other existing employee protective arrangements, we think this proves no more than the correct interpretation of the first sentence of Art. I, § 3 of Appendix C–1 (*see* footnote 17, *supra*). However, a fair reading of the prohibitions against

duplication or pyramiding of benefits qualifies this "no superseding of benefits" language. That is to say, choosing to receive the benefits provided under Appendix C–1 will not preclude an employee from receiving benefits provided under other existing employee protective arrangements, except to the extent that receiving such other benefits would run afoul of the prohibitions against duplication or pyramiding of benefits.

22. The following passage appears in the opinion of the dissenting member in the "Weston award" proceedings, which purports to explain both the concepts of duplication and of pyramiding of benefits:

> [A]n employee covered by the [collective bargaining] agreement who chooses the "moving expense" protection of Appendix C–1 must accept the obligations as well as the benefits of the specific provision in Appendix C–1 which provides that protection—he cannot have both the "moving expense" allowance provided in Appendix C–1 and the "moving expense" allowance provided in the [collective bargaining] Agreement as that would be duplication; nor may he select the more attractive benefit of a specific provision of one formula of protection and the lesser obligations contained in a similar provision in another formula of protection as that would be pyramiding. "*Each* benefit carries with it the obligations which accompany *that* benefit." (emphasis in original).

Although we are in total agreement with this interpretation of the prohibition against the duplication of benefits, we must disagree with the interpretation of the prohibition against the pyramiding of benefits. The dissenting member cites no source material compelling his in-

final proviso, which is intended to embody the prohibition against pyramiding, could be interpreted here in such a manner as to render the prohibition meaningless.[23]

We do not believe that the ICC intended its rephrasing of the prohibition against pyramiding to strip that provision of all its substance, and so we advance what we believe to be encompassed by the concept of pyramiding, and then illustrate by example what we believe is and what we believe is not prohibited by the language of the final proviso. First, we believe that the concept of pyramiding refers to a situation where the same type or kind of benefit is made available to an employee under two or more employee protective arrangements, and those benefits differ only as to amount and duration. To use a variation of the example given in the BLE illustration reproduced in note 23, *supra*, let us assume that such benefits are wage protective provisions, one guaranteeing an employee 75% of

terpretation of the concept of pyramiding. Moreover, the final quoted sentence in the above passage, which the dissenting member excerpted from Secretary Hodgson's affidavit in the *Congress of Railway Unions v. Hodgson* litigation, *see* p. 97 *supra*, was not, in its original context, clearly intended as an interpretation of the prohibition against pyramiding of benefits. More likely, it was merely a paraphrasing of the final proviso of Art. I, § 3 of Appendix C–1: "provided further, that the benefits under this Appendix, or any other arrangement, shall be construed to include the conditions, responsibilities and obligations accompanying such benefits." *See* note 17 *supra*. From all appearances, the language in this final proviso was intended to operate independently of both the language in the first proviso (concerning the prohibitions against both duplication and pyramiding of benefits) and the language in the section's introductory clause (preserving existing employee benefits under other arrangements). Because the practice of linking the greater benefits of one provision to the lesser obligations of another provision already appears to be clearly prohibited by the final proviso of Art. I, § 3 of Appendix C–1, we decline to follow the dissenting member's opinion which ascribes this function to the prohibition against pyramiding of benefits. Although our interpretation of the prohibition against pyramiding of benefits is not compelled by any source material, at least it is consistent with the original language of Art. I, § 3 of Appendix C–1 and ensures that each of its elements retains substantive effect. *See* text pp. 100–101 *infra*.

**23.** It would appear that intervenor-respondent Brotherhood of Locomotive Engineers ("BLE") approaches such an interpretation of the language that the ICC employed to express the prohibition against pyramiding of benefits, as the following excerpt from its brief demonstrates:

For example, a forty year old locomotive engineer employed on the Burlington Northern at the time of its merger on March 1, 1971, could have lifetime employment and earnings under the attrition-type protection imposed in that case. If the Burlington Northern merged with the St. Louis-San Francisco Railway, as is proposed, the Commission would now impose the so-called *New York Dock* conditions before the Court. Under those conditions, the employee would only have six years protection. However, since 1971, the engineer's earnings have increased so that his guaranteed earnings may no longer be indicative of his earning capacity. Naturally, it would be appropriate and to his benefit to have the greater test period earnings used to determine any wage loss that he may incur from the second transaction or merger. Under petitioners' theory, the employee should be placed in a no-win situation. If he doesn't select the latest imposed conditions, he suffers unreimburseable losses. If he does, he suddenly finds himself at age 54 without any protection, including the loss of privileges and fringe benefits.

Brief for Intervenor-Respondent BLE at 20–21.

While this example stops just short of stating precisely what benefits the hypothetical engineer could receive consistent with the rephrased prohibitions against duplication or pyramiding of benefits, its direction seems clear: the engineer should not be limited to either the higher six year wage compensation provisions or the lower lifetime wage compensation provisions, but should be entitled to either some hybrid form of wage protection combining the best aspects of both provisions (an interpretation we believe is clearly incorrect in light of the final proviso of Art. I, § 3 of Appendix C–1, *see* notes 17 and 22 *supra*, and effectively prohibited by the identical language contained in the "New York Dock conditions," *see* p. 96 *supra*) or, at minimum, entitled to elect coverage under the higher wage protective provisions for six years, and then to resume coverage under the lower lifetime wage protective provisions (an interpretation we believe would have been clearly incorrect under the language expressing the prohibition against pyramiding of benefits in Art. I, § 3 of Appendix C–1, but which is arguably consistent with the ICC's rephrasing of the prohibition against pyramiding of benefits contained in the "New York Dock conditions," *see* text p. 96 *supra*).

his most recent annual earnings for life, the other guaranteeing an employee just for a six year period 100% of his most recent annual earnings, and also providing for subsequent indexing to keep current with cost of living and wage increases. We believe that an employee would be engaging in a prohibited pyramiding of benefits if he elected coverage under the employee protective arrangement containing the higher guaranteed wage for a six year period, and then, at the expiration of that wage protective period, elected to receive the lower guaranteed wage for the remainder of his life.

▮ We do not, however, subscribe to the view expressed in the "Weston award" that the concept of pyramiding has any application to a situation where different types or kinds of benefits are made available to an employee under two or more employee protective arrangements. As an illustration, let us assume the existence of two identical employee protective arrangements, except that one arrangement contains a provision guaranteeing an employee retraining rights for a six year period, while the other arrangement contains a provision guaranteeing him a right of priority in rehiring until he reaches normal retirement age. We do not believe that once an employee elects to be covered by the arrangement containing the retraining rights provision, the prohibition on pyramiding of benefits should pre-

clude him from electing to be covered by the rehiring priority provision in the other arrangement at the same time. Furthermore, we take "the remainder, if any" language in the final proviso to mean that if all benefits in the retraining rights package originally elected by the employee expired at the end of a six year period, and the employee by that time had not yet reached normal retirement age, the prohibition against pyramiding of benefits would not prevent him from continuing to be covered by the rehiring priority provision for the remainder of its term, notwithstanding the fact that the principal benefit package that he originally had elected has expired.[24]

▮ To summarize briefly, we believe that the ICC, in formulating the final proviso dealing with the prohibition against pyramiding of benefits, intended its meaning to be substantially as follows: when component benefits are provided under different sets of employee protective conditions, and those benefits differ only as to duration and amount, and not as to type or kind, then an employee, in electing coverage under one set of employee protective conditions, receives such component benefits to the exclusion of similar component benefits provided under the other sets; however, when different sets of employee protective conditions contain component benefits that differ as to type or kind between the sets, then an employee, in electing coverage under one

---

24. The ICC, both in its brief and at oral argument, placed great stress on the fact that an employee, upon the expiration of the benefits provided under the plan originally selected, would be entitled to the benefits contained in the plan not selected only "for the remainder, if any, of [the] protective period under that arrangement." Apparently the ICC believes that this limiting phrase captured the essence of the original prohibition against pyramiding of benefits contained in Appendix C–1. Certainly, however, the two cannot be equated. The very concept of pyramiding has no relevance to a situation where benefits provided under different plans expire at the same time. Thus, in those situations where there are no "remainder benefits" in existence when the benefits provided under the originally selected plan expire, pyramiding of benefits is prevented, not by any prohibition against pyramiding, but as there are no "benefits" to pyramid, by force of logic.

Our interpretation of the ICC's rephrasing of the prohibition against pyramiding is not an attempt to substitute our view for that of the agency. As previously developed, an employee could not receive the same type of benefit under different plans at the same time, for that would be prohibited duplication. See note 22 supra. Further, an employee could not combine the greater benefits of one provision with the lesser obligations of another, for that would be prohibited by the final proviso of Art. I, § 3 of Appendix C–1, language that has been included verbatim in the "New York Dock conditions." See note 17 and text p. 96, supra. Therefore, since it seems apparent that the ICC wished to soften the harsh effect of the Weston interpretation without depriving the prohibition against pyramiding of all content, we believe our interpretation of the Commission's language to be the intended one.

set of employee protective conditions, should not be rendered ineligible to receive benefits contained in the other sets that have no counterpart in the set he elected. This construction of the final proviso would seem to retain genuine substance in the prohibition against pyramiding of benefits, while at the same time circumventing the most objectionable aspects of the "Weston award."

In conclusion, we are unable to agree with petitioners that the ICC's imposition of the "New York Dock conditions" is not supported fully by a fair reading of the statutory authority contained in 49 U.S.C. § 11347. We are not unmindful of the fact that the ICC's imposition of these labor protective conditions may place substantial hurdles in the path of rail carrier management seeking to consummate in a smooth and rapid manner transactions covered by 49 U.S.C. §§ 11343–11346. If that proves to be the case, however, the solution would appear to lie in an appeal to Congress, rather than to the courts.

The petition for review is denied, and the ICC's decision of February 9, 1979 is affirmed.