905 F.2d 463
 134 L.R.R.M. (BNA) 2511, 284 U.S.App.D.C. 358,
115 Lab.Cas. P 10,138
 UNITED TRANSPORTATION UNION, Petitioner,
v.
UNITED STATES of America, Interstate Commerce Commission, Respondents,
Norfolk Southern Corporation, et al., Illinois Central
Railroad Company, Intervenors.
UNITED TRANSPORTATION UNION, Petitioner,
v.
UNITED STATES of America, Interstate Commerce Commission, Respondents.
 Nos. 89-1216, 89-1662.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 13, 1990.
Decided June 15, 1990.
 
 Gordon P. MacDougall and William G. Mahoney, Washington, D.C., for petitioner in Nos. 89-1216 and 89-1662.
 Laurence H. Schecker, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, and Henri F. Rush, Deputy Gen. Counsel, I.C.C., Washington, D.C., were on the brief, for respondent I.C.C. Robert J. Wiggers, John J. Powers III and Andrea Limmer, Attys., U.S. Dept. of Justice, Washington, D.C., entered appearances, for respondent U.S.
 Jeffrey S. Berlin, Washington, D.C., with whom W.P. Stallsmith, Jr., Atlanta, Ga., and R.J. Cooney, Norfolk, Va., for Norfolk Southern Corp. et al., Robert H. Wheeler and William C. Sippel, Chicago, Ill., for Illinois Central R. Co., were on the joint brief, for intervenors.
 Before EDWARDS, SENTELLE and THOMAS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case presents challenges by the United Transportation Union ("UTU") to two orders of the Interstate Commerce Commission ("ICC" or "Commission"). One of the Commission's orders approved an agreement between Illinois Central Railroad ("Illinois Central") and Southern Railway Company ("Southern"), in which Southern acquired from Illinois Central a stretch of line and some trackage rights. The second Commission order rejected a claim that, under the applicable New York Dock labor-protective provisions, the Illinois Central employees who elected to go to work for Southern were entitled to carry with them all of the terms and benefits of the collective bargaining agreement between UTU and Illinois Central. On this latter point, the ICC upheld the judgment of an arbitrator, who ruled that the employees from Illinois Central who opted to work for Southern should be covered by the terms of the existing collective bargaining agreement between Southern and UTU, and not the separate collective bargaining agreement between Illinois Central and UTU.
 
 
 2
 The heart of the UTU's claim is that, under section 2 of the applicable New York Dock labor protective conditions, the Commission must ensure the continuation of the terms and benefits of existing collective bargaining agreements pursuant to railroad transactions of the sort at issue here. The ICC found no application for section 2 because the transaction between Southern and Illinois Central did not result in the abrogation of any rights under existing collective bargaining agreements. The transaction merely involved a purchase of assets, not a merger or an acquisition of an entire operation. As a consequence, both Southern and Illinois Central remained in existence as separate, independent and unaffiliated companies. In addition, the existing collective bargaining agreement between Illinois Central and UTU remained in force, as did the separate agreement between Southern and UTU. Thus, any employee who was affected by the transaction and who elected to stay in the employ of Illinois Central received labor protections plus the full benefits of the Illinois Central-UTU labor agreement; and any Illinois Central employee who opted, instead, to go to work for Southern received labor protections plus the full benefits of the Southern-UTU collective bargaining contract.
 
 
 3
 Under the foregoing circumstances, the ICC ruled that section 4, not section 2, of the New York Dock conditions applied. Under section 4, the railroads were required to give notice of their proposed transaction, negotiate with the employees' bargaining agents over labor protections, and then submit any unresolved issues to a neutral referee for final and binding arbitration. Because these conditions were met, and because the arbitrator's award was found to be fully consistent with the law, the Commission denied the UTU's challenges. We can find no basis to overturn the judgments of the Commission in this case. Accordingly, the petitions for review will be denied.
 
 I. BACKGROUND
 
 4
 The principal facts in this case are fully summarized in the Commission's decision in Southern Ry. Co., et al.--Purchase-- Illinois Cent. R.R. Co., 5 I.C.C.2d 842 (1989) ("Arbitrator Affirmance Decision "), as follows:
 
 
 5
 On June 8, 1987, IC Industries (IC), the parent company of Illinois Central Gulf Railroad (ICG) issued a press release reporting that an agreement in principle had been reached for the sale of certain ICG lines and grant of trackage rights to Southern Railway Co. (Southern). In anticipation of acquiring and operating the IC lines and trackage rights at issue, officials of Southern and the UTU (representing certain employees of Southern) entered into an agreement on July 29, 1987 that modified their existing collective bargaining agreements. The agreement essentially specified the operating divisions to which the lines would be assigned, the number and type of crew members that would operate trains after the acquisition, the allowances that the crew members would receive, the applicability of Southern collective bargaining and schedule agreements to the line of railroad and trackage rights to be acquired, and several other matters. On July 30, 1987, Southern and [Norfolk Southern Corporation, the parent company of Southern] filed with [the Commission] their notice of intent to file an application seeking approval of the transactions, as required by 49 C.F.R. Sec. 1180.4(b). They concluded an agreement with IC on August 17, 1987, regarding the proposed line sale and grant of trackage rights and filed an application for approval of these transactions on October 30, 1987. Southern and IC gave notice of the proposed transaction to their affected employees on November 2, 1987. On November 19, 1987, representatives of Southern and IC met with UTU General Chairmen representing both Southern and IC employees in an attempt to negotiate an implementing agreement in anticipation of ICC approval of the transaction.
 
 
 6
 Failure to reach an implementing agreement led to the voluntary submission by all parties to an arbitration hearing on March 17, 1988, as required by Article I, Section 4 of the New York Dock ... labor protective conditions. During the arbitration process, UTU questioned the validity of the July 29 collective bargaining agreement. In addition, by petition filed March 28, 1988, UTU sought reopening of the record ... and a ruling that the arbitrator had jurisdiction over the July 29 agreement. In Southern & Norfolk, [Purchase Decision, Finance Docket No. 31088, rendered May 9, 1988, reprinted in Joint Appendix ("J.A.") 206], approving the transaction, [the Commission] denied the petition as premature. Because the issue of the scope of the arbitrator's jurisdiction had been raised before the arbitrator, [the Commission] concluded that UTU could raise that issue in connection with any appeal it might chose to take from the arbitration decision when it was issued.
 
 
 7
 The arbitrator's decision and award was issued on May 2, 1988. The arbitrator fashioned an implementing agreement and discussed UTU's reservations about the July 29 agreement. He concluded that IC employees joining Southern could not retain the benefits of their collective bargaining agreement with IC. Article II(B) of the implementing agreement he fashioned provided that "IC employees accepting employment with Southern ... will be governed by the provisions of the Agreements between Southern and the UTU."
 
 
 8
 Id. at 843-44 (footnotes omitted).
 
 
 9
 The Commission's approval of the railroads' transactions was made subject to appropriate labor protective conditions. See Purchase Decision at 5-6, reprinted in J.A. 210-11. Under section 11347 of the Interstate Commerce Act (the "Act"),
 
 
 10
 When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under Section 405 of the Rail Passenger Service Act (45 U.S.C. 565).
 
 
 11
 49 U.S.C. Sec. 11347 (Supp. V 1987).[1] In order to satisfy the labor protective requirements of section 11347 in this case, the Commission imposed the so-called "New York Dock " conditions, see New York Dock Ry. Control--Brooklyn E. Dist. Terminal, 360 I.C.C. 60, 84-90 (1979), aff'd, New York Dock Ry. v. United States, 609 F.2d 83 (2d Cir.1979), to cover Southern's acquisition of the line from Illinois Central; for Southern's acquisition of trackage rights from Illinois Central, the Commission imposed the employee protective conditions of Norfolk and Western Ry. Co.--Trackage Rights--BN, 354 I.C.C. 605 (1978), as modified in Mendocino Coast Ry. Inc.--Lease and Operate--California Western R.R., 360 I.C.C. 653 (1980); and for Illinois Central's petition for exemption and discontinuance, the Commission imposed the employee protective conditions set forth in Oregon Short Line R.R. Co.--Abandonment--Goshen, 360 I.C.C. 91 (1979) ("Oregon III").[2] See Purchase Decision at 5-6, reprinted in J.A. 210-11.
 
 
 12
 On June 7, 1988, UTU petitioned the Commission to reopen and reconsider the Purchase Decision, and also to review the arbitration award rendered on May 2, 1988. See UTU Petition to Reopen and For Reconsideration, June 7, 1988, reprinted in J.A. 239-52. On June 8, 1988, UTU petitioned this court for review of the Purchase Decision. However, on March 28, 1989, this court held that, because UTU had filed a petition for reconsideration with the Commission that was still pending, the Commission's order in the Purchase Decision was not final with regard to UTU. Accordingly, the court dismissed UTU's petition on jurisdictional grounds. See United Transp. Union v. ICC, 871 F.2d 1114 (D.C.Cir.1989). On the same day on which the court reached this decision, UTU withdrew its petition for reconsideration before the Commission, see J.A. 507 (UTU Notice of Withdrawal, March 28, 1989), and, also on the same day, petitioned this court (in No. 1216) for review of the Purchase Decision.
 
 
 13
 In 89-1662 UTU petitions for review of the Commission's Arbitrator Affirmance Decision. In that decision, the Commission concluded that the July 29 Agreement between Southern and UTU was not an "implementing agreement" within the meaning of the New York Dock conditions, and therefore was not subject to the requirements of those conditions. Instead of being an "implementing agreement," the Commission reasoned, the July 29 Agreement was "an agreement between Southern and its employees which expressly modifies provisions of their existing collective bargaining agreements concerning these matters, including crew consist, exclusive to Southern operations, which are customarily subjects for collective bargaining between employer and employees." Arbitrator Affirmance Decision, 5 I.C.C. 2d at 848. Moreover, the fact that the July 29 Agreement "contemplate[d] integration of new lines into Southern's operations and would obviously affect the operations following consummation" did not make it an implementing agreement, because it was "confined to collective bargaining subjects" and "silent with respect to selection or assignment of forces and allocation of work resulting from consummation of the [Illinois Central-Southern] transactions." Id. at 848-49.
 
 
 14
 The Commission explicitly disavowed the arbitrator's discussion of the supposed conflict between sections 2[3] and 4[4] of the New York Dock conditions. The Commission found that, under the railroads' transactions,no provision of any collective bargaining agreement was modified. Rather, an implementing agreement was established which had the effect of harmonizing the collective bargaining agreement between [Illinois Central] and its employees and the one between [Southern] and its employees for the purpose of facilitating consummation of these specific transactions.
 
 
 15
 Id. at 852 n. 13.
 
 II. ANALYSIS
 A. Standard of Review
 
 16
 This court's "role upon review of the substantive validity of the Commission's decision is limited. We must affirm the Commission's decision unless we find that it is arbitrary and capricious or in excess of the Commission's statutory authority." National Classification Comm. v. United States, 779 F.2d 687, 694 (D.C.Cir.1985) (citation omitted).
 
 
 17
 It is not disputed in this case that the ICC has statutory authority under the Interstate Commerce Act to review an arbitration award such as the one at issue in this case. Cf. International Bhd. of Elec. Workers v. ICC, 862 F.2d 330, 338 (D.C.Cir.1988).[5] Thus, the focus of our review is limited to determining whether the Commission "considered all relevant factors and provided a reasoned explanation for its decision," Iowa Terminal R.R. Co. v. ICC, 853 F.2d 965, 969 (D.C.Cir.1988) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). In particular, we must determine whether the Commission's decisions articulate a "rational connection between the facts found and the choice made," "entirely failed to consider an important aspect of the problem," offer judgments so implausible as not to be ascribable to agency expertise, see State Farm, 463 U.S. at 43, 103 S.Ct. at 2866 (citation omitted), or diverge without explanation from agency precedent, see Cross-Sound Ferry Servs., Inc. v. ICC, 873 F.2d 395, 398 (D.C.Cir.1989).
 
 B. The Arbitrator Affirmance Decision
 
 18
 Petitioner argues that the arbitrator "overrode" collective bargaining rights by declaring that Illinois Central employees who elected to go to work for Southern could not retain the benefits of the collective bargaining agreement between UTU and Illinois Central. According to UTU, the arbitrator "eliminat[ed] [Illinois Central] employees' rights under the [Illinois Central-UTU] agreement and forc[ed] those employees to accept different rights under the different [Southern-UTU] agreement." See Brief for Petitioner at 33. It is from this pivotal premise that UTU launches its central challenge to the Arbitrator Affirmance Decision; namely, that "by suggesting that Section 11347 gives its arbitrators the authority to override collective bargaining agreements, the Commission has ignored the plain language of the statute." See id. at 26. This argument is without merit, however, for it fails to establish the truth of its animating premise, i.e., that the arbitrator's award "overrode" the Illinois Central-UTU collective bargaining agreement. In response to this claim, the Commission stated that "no provision of any collective bargaining agreement was modified" by the transactions between Illinois Central and Southern. See Arbitrator Affirmance Decision, 5 I.C.C. at 852 n. 13. We agree.
 
 
 19
 The disputed transactions in this case involved only the purchase of assets that may result in the displacement of some workers. The transactions did not involve the merger of two companies or the acquisition of one by the other. After all of the contemplated transactions, Southern and Illinois Central remained in existence as independent companies, and both their bargaining units and collective bargaining agreements remained intact.[6] We cannot imagine how the Illinois Central employees could carry the Illinois Central-UTU collective bargaining agreement with them into the employ of Southern, since there was already a union at Southern serving as the exclusive bargaining agent for the train service employees at Southern. UTU cites no legal authority supporting such a result, and we know of none.
 
 
 20
 The Illinois Central-UTU labor agreement covers only employees working for Illinois Central in the designated bargaining unit; this agreement in no way binds Southern or its employees. Indeed, UTU concedes that, absent the purchase agreement between Southern and Illinois Central, the displaced Illinois Central employees would have no right to jobs with Southern. It is true that under the implementing agreement devised by the arbitrator, Southern agreed conditionally to offer employment to specified classes of Illinois Central employees. See Arbitrator Decision at 5, reprinted in J.A. 258; Arbitrator Affirmance Decision, 5 I.C.C. 2d at 844 n. 6. However, the Illinois Central employees were not obliged to accept Southern's offer; if they refused they could remain in the employ of Illinois Central, retaining the full benefits of both the Illinois Central-UTU collective bargaining agreement and the labor protections imposed by the Commission. Any Illinois Central workers who elected to go to work for Southern received the benefits of the Southern-UTU collective bargaining agreement, plus labor protections. There is nothing in this deal that results in the abrogation or modification of a labor agreement, or in the loss of collective bargaining rights for any employee.
 
 
 21
 Petitioner calls attention to the Commission's potentially puzzling characterization of the arbitrator's decision as a "harmonization" of the Southern-UTU and Illinois Central-UTU collective bargaining agreements. See Brief for Petitioners at 33 (citing Arbitrator Affirmance Decision at 852 n. 13). This language in the Commission decision may appear not to cohere with the Commission's principal theory of the case, namely, that the arbitrator's award neither "overrode" nor modified any collective bargaining agreement--after all, the term "harmonization" might suggest that the "harmonized" texts are modified in some way.
 
 
 22
 This court "will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " State Farm, 463 U.S. at 43, 103 S.Ct. at 2867 (citation omitted). Considered in context, the "harmonization" language is not inconsistent with the Commission's central holding in the Arbitrator Affirmance Decision. The language appears immediately after the Commission's holding that "no provision of any collective bargaining agreement was modified." Arbitrator Affirmance Decision, 5 I.C.C.2d at 852 n. 13. In light of the Commission's plainly correct finding that no provision of any labor contract had been modified, the reference to "harmonization" seems to suggest nothing more than that the arbitrator approved an implementing agreement without in any way altering the bargaining rights under the existing collective bargaining agreements at Southern and Illinois Central.
 
 
 23
 Thus, there is no error in the Commission's judgment that section 2 of the New York Dock conditions was not violated. Section 2 says that "all collective bargaining and other rights ... under existing collective bargaining agreements ... shall be preserved...." See note 3 supra. In this case, these rights were "preserved" because the Illinois Central-UTU labor agreement was never modified in connection with the Southern-Illinois Central transactions. It is irrelevant that some employees may have been displaced, for section 2 is not by its terms a protection against job displacement. Rather, it is a protection of bargaining rights as they may be found in existing labor contracts. Cf. Pittsburgh & Lake Erie R.R. Co. v. R.L.E.A., --- U.S. ----, 109 S.Ct. 2584, 2593, 105 L.Ed.2d 415 (1989) (railroad's "sale of assets" did not constitute modification of any provision in any of its collective bargaining agreements). Here, the displaced employees could still exercise any applicable rights they had under the Illinois Central-UTU labor contract, and they also had the benefit of labor protections. Moreover, a significant number of the Illinois Central employees were given an opportunity to work at Southern. In these circumstances, there was no breach of section 2 of the New York Dock conditions.
 
 
 24
 Furthermore, we can find no merit in UTU's objection to the July 29 Agreement between Southern and UTU. As the Commission correctly found, this agreement was not an "implementing agreement" under section 4 of the New York Dock conditions. Rather, the July 29 Agreement was simply a lawful modification of the existing labor contract between Southern and UTU; so we must agree with the Commission's judgment that it is immaterial that the "modifications were negotiated in anticipation and in advance of notice and application for approval of line acquisition and trackage rights." Arbitrator Affirmance Decision, 5 I.C.C.2d at 848. "UTU had the opportunity to fully participate in the process leading to the development of an implementing agreement." Id. at 851. Indeed, "[a]though he rejected UTU's proposals for continued coverage of former [Illinois Central] employees accepting Southern employment by [Illinois Central] collective bargaining agreements, the arbitrator did adopt various other proposals of UTU. These dealt with crediting of prior service for vacations, suitable transportation for relief and other than normal on and off-duty points, [and] rights to promotion as conductor." Id. at 853. In these circumstances, petitioner has no cause for complaint over the legality of either the July 29 Agreement or the process leading to an implementing agreement.
 
 
 25
 In sum, we uphold the Commission's judgment that Illinois Central employees who elected to go to work for Southern could not retain coverage under the labor contract between UTU and Illinois Central. The Commission's decision in support of this judgment was neither arbitrary, capricious nor in excess of the Commission's statutory authority.
 
 C. The Purchase Decision
 
 26
 The final issue in this case involves UTU's relatively spare argument challenging a procedural ruling by the Commission in the Purchase Decision proceeding. UTU suggests that the Commission erred in refusing to reconsider its decision or reopen the record in the Purchase Decision. UTU sought a Commission ruling that the arbitrator had jurisdiction over the July 29 Agreement under section 4 of the New York Dock conditions. See UTU Petition to Reopen for Further Evidence, March 28, 1988, reprinted in J.A. 50-54. The Commission denied UTU's petition on the ground that "[t]he issue in the petition is premature since it has been raised in the proceedings now before the arbitrator and, upon issuance of the arbitrator's decision, [UTU] can appeal the matter to the Commission." Purchase Decision at 3 n. 9, reprinted in J.A. 208.[7]
 
 
 27
 In refusing to reopen, the Commission was following its policy that "once mandatory arbitration has been invoked under labor-protective conditions we have imposed, we will decline jurisdiction to hear arbitrable issues until an appeal of the arbitral award to the Commission." Arbitrator Affirmance Decision, 5 I.C.C.2d at 847 n. 9 (citation omitted); see also Brief of Respondent at 32 n. 26 (citing ICC decisions). Petitioners do not contend that the Commission was somehow diverging from this policy, or, in following it, was straying from some other established Commission policy. Rather, petitioners make only the bald assertion that the policy is "not a commendable agency practice," and "will have a chilling effect upon arbitration well in advance of consummation date." Brief for Petitioners at 37. Additionally, petitioners assert that "[a]n early resolution of labor questions would be helpful to the transportation system." Id.
 
 
 28
 We can find no merit in UTU's claims. For one thing, it is perfectly plausible for the ICC to allow arbitrators appointed pursuant to the Commission's labor-protective conditions to do their work without interlocutory interference from the Commission; if anything, this should expedite, rather than "chill," the arbitral process. As for the petitioner's contention about the desirability of "early resolution of labor questions," there is no reason to believe that such questions will be resolved more rapidly under a system more amenable to interlocutory rulings than the Commission has chosen to impose; and, in any event, such judgments about the value of "early resolution" and the best method of achieving it are well within the expertise of the Commission.
 
 
 29
 For these reasons, we have no legitimate basis to conclude that the Commission acted in an arbitrary or capricious way in denying UTU's petition to reconsider its decision or reopen the record in the Purchase Decision.
 
 III. CONCLUSION
 
 30
 For the foregoing reasons, we conclude that in neither proceeding did the Commission behave arbitrarily, capriciously, without the scope of its discretion, or beyond its statutory authority. Accordingly, we deny the petitions for review.
 
 
 31
 So ordered.
 
 
 
 [1]
 45 U.S.C. Sec. 565 provides, in part, that the "fair arrangement" to which section 11347 refers
 shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) to such employees under existing collective-bargaining agreements or otherwise; (2) the continuation of collective-bargaining rights;....
 45 U.S.C. Sec. 565(b) (1982).
 
 
 [2]
 Only the New York Dock conditions are at issue in this case
 
 
 [3]
 Section 2 of the New York Dock conditions provides:
 The rates of pay, rules, working conditions and all collective bargaining and other rights, privileges and benefits ... of the railroad's employees under applicable laws and/or existing collective bargaining agreements or otherwise shall be preserved unless changed by future collective bargaining agreements or applicable statutes.
 New York Dock, 360 I.C.C. at 84.
 
 
 [4]
 Section 4 provides in part that:
 Notice and Agreement or Decision--(a) Each railroad contemplating a transaction which is subject to these conditions and may cause the dismissal or displacement of any employees, or rearrangement of forces, shall give at least ninety (90) days written notice of such intended transaction by posting a notice on bulletin boards convenient to the interested employees of the railroad and by sending registered mail notice to the representatives of such interested employees. Such notice shall contain a full and adequate statement of the proposed changes to be affected [sic] by such transaction....
 Prior to consummation the parties shall negotiate in the following manner.
 Within five (5) days from the date of receipt of notice, at the request of either the railroad or representatives of such interested employees, a place shall be selected to hold negotiations for the purpose of reaching agreement with respect to application of the terms and conditions of this appendix, and these negotiations shall commence immediately thereafter and continue for at least thirty (30) days. Each transaction which may result in a dismissal or displacement of employees or rearrangement of forces, shall provide for the selection of forces from all employees involved on a basis accepted as appropriate for application in the particular case and any assignment of employees made necessary by the transaction shall be made on the basis of an agreement or decision under this section 4. If at the end of thirty (30) days there is a failure to agree, either party to the dispute may submit it for adjustment in accordance with the following procedures:
 (1) Within five (5) days from the request for arbitration the parties shall select a neutral referee and in the event they are unable to agree within said five (5) days upon the selection of said referee then the National Mediation Board shall immediately appoint a referee.
 (2) No later than twenty (20) days after a referee has been designated a hearing on the dispute shall commence.
 (3) The decision of the referee shall be final, binding and conclusive and shall be rendered within thirty (30) days from the commencement of the hearing of the dispute.
 (4) The salary and expenses of the referee shall be borne equally by the parties to the proceeding; all other expenses shall be paid by the party incurring them.
 (b) No change in operations, services, facilities, or equipment shall occur until after an agreement is reached or the decision of a referee has been rendered.
 New York Dock, 360 I.C.C. at 85.
 
 
 [5]
 In the administrative proceedings that gave rise to IBEW, a railroad company sought Commission approval, pursuant to 49 U.S.C. Sec. 10903 (1982), for the abandonment of two rail lines. In approving the abandonments, the Commission undertook to meet the requirement of 49 U.S.C. Sec. 10903(b)(2) that it impose employee protective measures by imposing the conditions formulated by the ICC in Oregon III. The Commission later reviewed the decision of the arbitrator whose appointment the Oregon III conditions allowed and the petitioner, a union, challenged the Commission's ensuing decision. This court rejected as "wholly untenable" the petitioner's claim that "under the statute governing the agency, the ICC cannot reclaim the authority that it has delegated to arbitrators to interpret, apply and enforce labor protective conditions." 862 F.2d at 335. The reasoning of IBEW applies equally here, where the Commission approved transactions under 49 U.S.C. Sec. 11347 as well as under 49 U.S.C. Sec. 10903, and imposed the New York Dock as well as the Oregon III conditions
 
 
 [6]
 Employees who left Illinois Central to work for Southern in connection with this transaction did so voluntarily; they had the opportunity to remain at Illinois Central under the Illinois Central-UTU collective bargaining agreement
 
 
 [7]
 As it happens, when the Commission made the Purchase Decision on May 9, 1988 (served May 18, 1988), the arbitrator had already issued the Arbitrator Decision seven days earlier. Petitioners do not suggest, and we do not conclude, that there was anything "arbitrary or capricious" in this oversight