**RAILWAY LABOR EXECUTIVES' ASSOCIATION, and United Transportation Union, Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION, and United States of America, Respondents,**

**CSX Transportation, Inc., and Wilmington Terminal Railroad, Inc., Intervenors.**

**No. 90–3621.**

United States Court of Appeals, Sixth Circuit.

Argued March 21, 1991.

Decided April 16, 1991.

L. Pat Wynns, John O'B. Clarke, Jr. (argued), Highsaw, Mahoney & Clarke, Washington, D.C., for petitioners.

Robert S. Burk, Louis Mackall (argued), I.C.C., Office of the Gen. Counsel, Washington, D.C., for I.C.C.

Robert J. Wiggers, U.S. Dept. of Justice, Antitrust Div., Cathrine G. O'Sullivan, U.S. Dept. of Justice, Anti–Trust Div., Appellate Section, Washington, D.C., for U.S.

Donald G. Avery, Kelvin J. Dowd, Slover & Loftus, Washington, D.C., for Wilmington Terminal R.R., Inc.

Ronald M. Johnson (argued), Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Nicholas S. Yovanovic, CSXT Transp., Inc., Law Dept., Jacksonville, Fla., Lawrence H. Richmond, CSX Transp., Inc., Baltimore, Md., for CSX Transp., Inc.

Before MILBURN and BOGGS, Circuit Judges, and GILMORE, District Judge *.

MILBURN, Circuit Judge.

Petitioners Railway Labor Executives' Association and United Transportation Union ("Rail Labor") seek review of an Interstate Commerce Commission ("ICC") decision which approved the sale and lease of a line of track and certain railroad equipment by one railroad to another without requiring the buyer, as a condition of its purchase, to negotiate with and hire the seller's employees who worked that line of track. For the reasons that follow, the petition for review is denied and the decision of the ICC is affirmed.

I.

CSX Transportation, Inc. ("CSXT") is a large Class I railroad which operates over 19,000 miles of rail lines. It decided to sell and lease approximately 224 miles of track and certain railroad equipment to Wilmington Terminal Railroad, Inc. ("WTR"), a tiny Class III short line carrier which operates approximately four miles of track and has only four employees. CSXT's 30,000 employees are unionized, but WTR's employees are not unionized. As a result of this sale, CSXT expects to terminate fifty-three employees and WTR expects to add forty-four to its work force.

Under the Interstate Commerce Act, particularly 49 U.S.C. §§ 11343 and 11347, the ICC must approve any such transaction between railroads, and in so doing it must require each railroad "to provide a fair arrangement ... protective of the interest of employees who are affected by the transaction...." 49 U.S.C. § 11347. The ICC normally meets this obligation to protect employee interests by predicating its approval of the transaction on certain "conditions." These vary according to the kind of transaction under consideration, but in *line sale cases* the statutory "fair arrangement" standard is usually met by the imposition, with certain exceptions, of the ICC's so-called *New York Dock* conditions, a set of labor protective conditions established in *New York Dock Railway—Control—Brooklyn Eastern District Terminal,* 360 I.C.C. 60, *aff'd sub nom. New York Dock Railway v. United States,* 609 F.2d 83 (2d Cir.1979). Substantially similar conditions for the protection of labor are imposed by the ICC as a condition precedent to lease

---

* Honorable Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting by designation.

transactions. *Mendocino Coast Ry.— Lease and Operate—California W.R.R.,* 354 I.C.C. 732 (1978), *modified,* 360 I.C.C. 653 (1980), *aff'd sub nom. Railway Labor Executives' Ass'n v. United States,* 675 F.2d 1248 (D.C.Cir.1982).

The *New York Dock* and *Mendocino* conditions, with certain exceptions, were imposed by the ICC in this case. Rail Labor challenges the particular application of those conditions and argues that they fall short of the "fair arrangement" specified in 49 U.S.C. § 11347.

In imposing the *New York Dock* and *Mendocino* conditions [1] with certain exceptions, the ICC required CSXT and WTR to negotiate with and protect their own employees but not their counterpart's employees. Rail Labor objected and argued that the *New York Dock* conditions should be construed in line sale cases to require negotiations between both railroads and their employees to work out an "umbrella" implementing agreement under which CSXT employees could "follow the work" to WTR and become its employees. Under Rail Labor's conception of the transaction, WTR should have been required to hire dismissed CSXT employees on a preferential basis and take them subject to all of the rights, privileges and protections they had acquired under their collective bargaining agreements ("CBAs") with CSXT.

However, to Rail Labor's dismay, the ICC began its discussion in this case by specifically overruling *Brandywine Valley Railroad Co.—Purchase—CSX Transportation, Inc.,* 5 I.C.C. 2d 764 (1989), *appeal pending,* No. 89–1503 (D.C.Cir. filed Aug. 21, 1989), the only precedent the ICC had ever set for the proposition that an "umbrella" implementing agreement—one reached by all the railroads and their employees—was required in line sale cases. In overruling *Brandywine,* the ICC rejected Rail Labor's interpretation of section 11347 and held that WTR need not negotiate with CSXT's employees, need not hire them on a preferential basis, and, as to any

actually hired, need not recognize their unions or their collective bargaining agreements with CSXT.

The result was to leave all of CSXT's employees fully possessed of their rights and privileges under their CBAs with CSXT. Any of the CSXT employees affected by the sale or lease could exercise their seniority and "bumping" rights under their agreements. Additionally, any CSXT employee on the bottom rung of the ladder who was displaced or dismissed would be eligible to receive *New York Dock* and *Mendocino* financial benefits from CSXT, benefits which protect 100 percent of the employee's earnings for up to six years. Since none of WTR's employees would lose his or her job as a result of WTR's line purchase and lease transaction, the transaction would have no impact on them or their relationship with WTR.

The issues in this case are whether the ICC exceeded its statutory authority (1) in declining to require WTR to hire CSXT's employees on a preferential basis, (2) in declining to require WTR to recognize and adhere to whatever contractual and collective bargaining rights the former CSXT employees had negotiated with CSXT, and (3) in declining to impose a requirement that WTR negotiate with CSXT's affected employees concerning their employment on WTR's lines.

## II.

### A.

The Administrative Procedure Act provides that "the reviewing court shall decide all relevant questions of law" and shall set aside any agency action found to be "short of statutory right." 5 U.S.C. § 706. Rail Labor insists that the ICC failed to accord CSXT's employees their rights under 49 U.S.C. § 11347.

When reviewing an agency's interpretation of a statute which the agency has primary responsibility for administering, we follow the guidelines set out in

---

**1.** Like the parties, we will refer to both sets of conditions as the *New York Dock* conditions for simplicity's sake.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984):

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Id. (footnotes omitted). We also recognize that a special deference is due the administrative interpretation of a statute "when an interpretation of a statute involves the reconciliation of conflicting policies." *Wayside Farm, Inc. v. United States Dept. of Health & Human Servs.,* 863 F.2d 447, 451 (6th Cir.1988). Therefore, we will accept an agency's construction of its own statute unless that construction is plainly "unreasonable." *Id.* at 452.

### B.

The ICC determined that WTR need not give hiring priority to former CSXT employees when WTR increased its work force as the result of its new acquisition. Rail Labor argues that this decision left CSXT employees short of the protections required in 49 U.S.C. § 11347, which in relevant part provides:

When a rail carrier is involved in a transaction for which approval is sought ..., the Interstate Commerce Commis-

sion shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565).

Thus, it is clear that the protective provisions of section 11347 come from two sources; *viz.,* (1) the protections imposed by the ICC under section 11347 before February 5, 1976, and (2) the protections established by section 405 of the Rail Passenger Service Act, 45 U.S.C. § 565. In *New York Dock Railway v. United States,* 609 F.2d 83, 94 (2d Cir.1979), the court agreed with the ICC's interpretation that the phrase "terms imposed under this section before February 5, 1976" refers to section 11347's predecessor statute, 49 U.S.C. § 5(2)(f). Section 5(2)(f), like section 11347, imposed on the ICC the duty to condition its approval of certain transactions on the arrangements made to protect affected employees:

As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions....

Section 5(2)(f) has been held to embody the *New Orleans* conditions [2], *New York Dock Ry.,* 609 F.2d at 94, which in turn have been held to include sections 4 and 5 of the Washington Job Protection Agreement of 1936 ("WJPA"). *Southern Ry.—Control—Central of Ga. Ry.,* 331 I.C.C. 151 (1967). The WJPA is a private contract between several railroad unions and many of the country's railroads, and sections 4 and 5 of that agreement provide that in matters of "coordinations"; *i.e., mergers,* participating railroads will give notice to their employees of the proposed merger and will then negotiate with their employees on matters of seniority and retention of em-

---

**2.** Labor protective conditions set up by the ICC in *New Orleans Union Passenger Terminal Case,*

282 I.C.C. 271 (1952).

ployees in order to implement the *merger* of work forces with a minimum of damage to the interests of employees. By this progression, section 11347 is held to embody the protections of sections 4 and 5 of the WJPA, and the parties substantially agree as to this.

The second source of protective provisions within section 11347 is the "terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565)." The Rail Passenger Service Act ("RPSA"), enacted in 1970, is the enabling legislation for Amtrak and is also known as the Amtrak Act. That Act contains provisions requiring the Secretary of Labor to approve and certify labor protective conditions as prerequisites to any sale of a railroad's passenger service operations to Amtrak, and, pursuant to that duty, the Secretary approved protective conditions known as the Appendix C–1 conditions.

In *New York Dock Railway v. United States*, 609 F.2d at 94, the Second Circuit agreed with the ICC that the reference to RPSA in section 11347 was intended by Congress to be a reference to the Appendix C–1 conditions and to mean that they were incorporated into section 11347 to define in part the parameters of its protections. It is important to note that the Appendix C–1 conditions, by their terms, are designed to apply only to a railroad transferring its passenger operations to Amtrak. They regulate its duties to its employees at and after the transfers contemplated by the

Act. On the other hand, Amtrak is regulated in its dealings with its own employees under a separate set of conditions, the Appendix C–2 conditions, not material here.[3]

1. "Terms Imposed Under This Section Before February 5, 1976"—First Prong of Section 11347.

Rail Labor argues that the foregoing language, which constitutes the first labor protective prong of section 11347, requires the ICC to condition its approval of the line sale and lease in this case on an agreement by WTR to hire CSXT's displaced employees on a preferential basis. The ICC declined to impose such a condition on WTR, and we believe that refusal was proper.

Basically, Rail Labor argues that, since the "terms imposed under this section before February 5, 1976" include sections 4 and 5 of the WJPA[4] regarding negotiations for work force integration, WTR must be forced to negotiate with CSXT employees to reach an agreement like that contemplated in the WJPA. Because the WJPA provides for negotiations aimed at "selection of forces from the employees of all the carriers involved ...," Washington Job Protection Agreement, § 5, Rail Labor concludes that the "selection of forces" language means that WTR must select CSXT's employees.

Rail Labor's argument is flawed, and the ICC was justified in rejecting it because the WJPA, by its express terms, applies solely

---

3. For a lengthy treatment of the historical evolution of section 11347, *see New York Dock Railway v. United States*, 609 F.2d 83, 86–90 (2d Cir.1979).

4. Section 4.—Each carrier contemplating a coordination shall give at least ninety (90) days written notice of such intended coordination by posting a notice on bulletin boards convenient to the interested employees of each such carrier and by sending registered mail notice to the representatives of such interested employees. Such notice shall contain a full and adequate statement of the proposed changes to be effected by such coordination, including an estimate of the number of employees of each class affected by the intended changes. The date and place of a conference between representatives of all the parties interested in such intended changes for the purpose of reaching agreements with

respect to the application thereto of the terms and conditions of this agreement, shall be agreed upon within ten (10) days after the receipt of said notice, and conference shall commence within thirty (30) days from the date of such notice.

Section 5.—Each plan of coordination which results in the displacement of employees or rearrangement of forces shall provide for the selection of forces from the employees of all the carriers involved on bases accepted as appropriate for application in the particular case; and any assignment of employees made necessary by a coordination shall be made on the basis of an agreement between the carriers and the organizations of the employees affected, parties hereto. In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with Section 13.

to "coordinations." These are defined in section 2(a) of the Agreement as

joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities.

This definition does not fit the transaction for which approval is sought in this case, and it would make no sense for the ICC to apply terms designed for mergers, in which the assets, management and labor of two organizations are fused into one, to a simple line sale or lease, in which one carrier conveys a thing to another carrier for money.

In *MT Properties v. Transportation–Communications International Union,* 914 F.2d 1083 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1389, 113 L.Ed.2d 445 (1991), a company leased to another railroad all of its rail assets for fifty years, terminated its rail employees, and went out of the railroad business entirely. The union argued that certain provisions of the WJPA required the railroad to engage in arbitration with its employees concerning the proposed lease. This contention was rejected by the court, however, because it found the WJPA applicable only to coordinations. *Id.* at 1091. In the court's view, the long-term leasing of the company's entire rail operation bore little resemblance to a merger. We agree with the Eighth Circuit and hold that the WJPA's notice and negotiation provisions do not apply to the present case which in no way resembles a merger.

Rail Labor is unable to cite any convincing authority for the application of the WJPA to a line sale or long-term lease transaction under section 11347 or any of its predecessors. Rail Labor cites *St. Louis Southwestern Railway—Purchase —Gibbons, Trustee,* 363 I.C.C. 323 (1980), as a case in which the ICC, in a railroad reorganization proceeding involving purchases, required levels of protection equal to those of sections 4 and 5 of the WJPA. The ICC imposed its *New York Dock* conditions to protect certain employees who would lose their jobs because they were not covered by a voluntary agreement entered into by Rail Labor and some of the railroads involved. Article 1, section 4, of the *New York Dock* conditions, which is the equivalent of, and the usual vehicle by which, the protections of sections 4 and 5 of the WJPA are applied, was thus theoretically applied in *St. Louis Southwestern Railway* when the ICC stated *generally* that it was imposing the *New York Dock* conditions. The specific notice and negotiation provisions Rail Labor relies on in the present case, however, were not even mentioned in that decision because they were not at issue. Employees not covered by the voluntary agreement were not forced on purchasers, nor were purchasers forced by the ICC to negotiate with those employees. Therefore, *St. Louis Southern Railway* does not support Rail Labor's argument that the WJPA notice and negotiation provisions apply in line sale cases to require some type of an umbrella implementing agreement.

Rail Labor also argues that *Southern Railway—Control—Central of Georgia Railway,* 331 I.C.C. 151 (1967), supports its position because in that case the ICC reasoned that, in situations where employees would be following their work to a new employer, the notice and negotiation rights embodied in sections 4 and 5 of the WJPA were indispensable. *Southern,* however, is a control case in which one railroad completely absorbed another. As such, it is exactly the kind of coordination case the WJPA was designed for, and that fact distinguishes it from the present case.

The cases relied upon by Rail Labor simply do not demonstrate that any part of the first prong of section 11347 requires the ICC to condition approval of a line sale on the buyer's agreement to hire the seller's employees. Rail Labor's arguments are based on provisions designed for mergers and other forms of coordinations, transactions distinctly different from the line sale in the present case.

2. "Terms Established Under Section 405 of the Rail Passenger Service Act"— Second Prong of Section 11347.

■ The second prong of section 11347 comprises the terms established under

RPSA, and, for the purposes of section 11347, the labor protective terms of RPSA are its Appendix C–1 conditions. *New York Dock Ry.*, 609 F.2d at 94. Rail Labor argues that the following language from article II, section 1, of those conditions supports its position that WTR should have been required to negotiate with and preferentially hire CSXT's employees:

> Any employee who is terminated or furloughed as a result of a transaction shall, if he so requests, be granted *priority of employment or reemployment* to fill a position comparable to that which he held when terminated or furloughed, even though in a different craft or class, *on Railroad* which he is, or by training or retraining physically and mentally can become, qualified, not however, in contravention of collective bargaining agreements relating thereto.

(Emphasis added).

There are two reasons why the quoted language does not support Rail Labor's position. First, in order for the C–1 conditions to support the preferential hiring argument, they would have to be shown to impose a preferential hiring requirement on a *buyer* in a line sale or equivalent transaction. The C–1 conditions, however, were developed to protect employees whose jobs were affected when the railroads they worked for sold their passenger operations to Amtrak. The conditions were applied to the selling railroads to assure that their affected employees were properly treated. The conditions were not designed for application to the buyer, Amtrak, and they were never applied to it.

Second, the language of article II, section 1, of the C–1 conditions does not support Rail Labor's argument. It provides only that an employee "be granted priority of employment or reemployment ... on Railroad." Throughout the C–1 conditions, the term "Railroad" is always used to denote the railroad transferring its passenger operations to Amtrak. Amtrak is always referred to as "the Corporation." Thus, the language means that an employee's right to be employed (hired in a different craft on the same railroad) or reemployed (hired in the same craft on the same railroad) is enforceable only against his employer, the railroad selling its passenger operations to Amtrak. It follows that there is no support in the language of the C–1 conditions for Rail Labor's argument that WTR must hire CSXT's employees on a priority basis.

Rail Labor also argues that the Urban Mass Transportation Act, 49 U.S.C. § 1609(c) ("UMTA"), supports its position because it was used as a partial pattern for the RPSA and must, therefore, have been incorporated sub silentio into section 11347 with the RPSA. This argument, if correct, would support Rail Labor's position because the UMTA requires, as a condition of federal assistance under the Act, that municipalities purchasing urban mass transportation systems from private owners give "assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off...." 49 U.S.C. § 1609(c)(4).

Section 11347 directly incorporated the protections of the RPSA; *i.e.*, the C–1 conditions, which do not require preferential hiring of the seller's employees by the buyer. Section 11347 did *not* incorporate the protections of the UMTA, which do require "assurances of employment." The fact that 49 U.S.C. § 1609(c) (UMTA) may have been a partial drafting pattern for 49 U.S.C. § 565(b) (RPSA) is irrelevant. Indeed, if conclusions are to be drawn from a comparison of the two statutory provisions, both of which were available for incorporation into section 11347 at the time of its enactment, the more reasonable conclusion is that Congress did *not* incorporate the UMTA provisions in section 11347 because it did *not* intend to require preferential hiring by transferee railroads.

Added to these statutory problems with Rail Labor's position is the absence of case authority to support its interpretation of section 11347. Indeed, the only authority in the subject area is *Brotherhood of Maintenance of Way Employees v. United States*, 366 U.S. 169, 174, 81 S.Ct. 913, 915, 6 L.Ed.2d 206 (1961), in which the Court

held that section 11347's predecessor, 49 U.S.C. § 5(2)(f), should not be interpreted to require railroads to guarantee, or "freeze," jobs that would otherwise be lost as the result of railroad mergers. According to the Court, Congress' intention in enacting section 5(2)(f) was to protect laid off employees by means of financial compensation under the *New Orleans* conditions and not to guarantee jobs forever.

Therefore, we hold that neither of the prongs of section 11347's protective labor provisions can reasonably be interpreted to require the ICC to condition its approval of WTR's lease and purchase transaction upon its agreement to hire CSXT's employees.

### C.

■ Rail Labor next argues that the ICC, pursuant to the labor protective role assigned it in section 11347, should have required WTR to hire displaced CSXT employees with their collective bargaining agreements intact. Under such a requirement, the displaced CSXT employees would become the employees of WTR under the terms and conditions previously established by their CBAs with CSXT. WTR, a railroad with four non-union employees, would suddenly be heavily unionized when CSXT's employees arrived with their "portable" CBAs because WTR would also be required to recognize its new employees' bargaining rights and union representation.

To support its argument, Rail Labor relies on two statutes, 45 U.S.C. § 565(b)(1), (2) (RPSA), and 49 U.S.C. § 1609(c)(1), (2) (UMTA), both of which are included in the second prong of section 11347, according to Rail Labor.

45 U.S.C. § 565(b) provides in relevant part:

> Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pen-

sion rights and benefits) to such employees under existing collective-bargaining agreements or otherwise; (2) the continuation of collective-bargaining rights....

The relevant provisions of 49 U.S.C. § 1609(c)(1), (2) are virtually identical to those in section 565(b).[5] Rail Labor argues that the specific language of these statutes requires portability of CBAs. We disagree.

The provisions in the RPSA sections relied upon by Rail Labor refer to protective arrangements between the selling railroad and its own employees. They do not apply to the buyer, Amtrak. A reading of the preceding subsection, 565(a), clearly shows that the subsection 565(b) language upon which Rail Labor relies, "*Such* protective arrangements ..." (emphasis added), refers back to subsection 565(a), which begins, "A *railroad* shall provide fair and equitable arrangements to protect the interests of employees...." (Emphasis added.) The statute, like its C–1 conditions, distinguishes between "railroad" and "the Corporation" in its references to the selling railroads and Amtrak, respectively. These sections, therefore, provide no support for Rail Labor's arguments because they were never intended to apply to the buyer in a line sale transaction.

Rail Labor's reliance on the UMTA, 49 U.S.C. § 1609(c), is likewise misplaced because, unlike 45 U.S.C. § 565, section 1609(c) is not mentioned in section 11347. It is farfetched to argue that section 1609(c), in its entirety, including its provision requiring assurances of employment to employees of acquired mass transportation systems, is incorporated in section 11347 when Rail Labor can cite no authority to support such a result. Because of the unique situation to which the UMTA applies, the "mysterious appearance" of *one* of its sections in a statute of general application would be, to say the least, surprising.

---

**5.** "Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including contin-

uation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights...." 49 U.S.C. § 1609(c)(1), (2).

Rail Labor's claim that CBAs are portable has recently been rejected, although in a somewhat different context. In *United Transportation Union v. United States*, 905 F.2d 463 (D.C.Cir.1990), Southern Railway Company purchased a line of track from Illinois Central Railroad. The union, which had different agreements with both railroads, insisted that Illinois Central employees transferring into the employ of Southern as a result of the transaction[6] had the right to take their CBAs with them. After reviewing Rail Labor's arguments, the court stated:

> We cannot imagine how the Illinois Central employees could carry the Illinois Central–UTU collective bargaining agreement with them into the employ of Southern, since there was already a union at Southern serving as the exclusive bargaining agent for the train service employees at Southern. *UTU cites no legal authority supporting such a result, and we know of none.*

905 F.2d at 468 (emphasis added).

Rail Labor has failed to show how its theory of portable CBAs can be derived from a reasonable interpretation of the language of section 11347, and existing authority does not support its position. Accordingly, we hold that the ICC was correct in declining to require WTR to assume CSXT's employees with their CBAs and bargaining rights intact.

## D.

Finally, Rail Labor argues that the ICC should have required WTR to bargain with CSXT and its employees over the terms on which CSXT's employees would be preferentially hired, CBAs intact, by WTR. However, since we have determined that the ICC was correct in declining to require WTR to give hiring priority to former CSXT employees with their CBAs intact, it follows that the ICC should not have required WTR to bargain with CSXT and its employees over the terms on which CSXT's employees would be preferentially hired.

Thus, we hold that, under the circumstances involved in this case, the ICC was correct in declining to require negotiations between WTR and CSXT's employees.

## E.

As we stated earlier, we will uphold an agency's reasonable interpretation of a statute it administers, particularly where its interpretation involves the reconciliation of conflicting policy issues. The area of policy at issue in this case has to do with the encouragement of the sales of marginally profitable lines of track by large railroads to smaller railroads which can operate them profitably. Thus, the ICC framed the issue as follows:

> The only remaining question, then, is whether we should require WTR as a matter of discretion to offer preferential hiring or to adopt CSX's CBAs. We think that relief is not warranted. To impose such a regime here, would be a strong disincentive for WTR to consummate the transaction and to take any former CSX employees. We think the soundest policy is to allow CSX employees who continue to be employed by that carrier to continue to enjoy the benefits of their CBAs and of the *New York Dock* conditions themselves, which were designed to cushion employees against hardship occasioned by transactions approved by the Commission. Employees who voluntarily seek employment with WTR under those circumstances do so with the knowledge that they are bound by the working conditions of that carrier.

*Wilmington Terminal R.R.—Purchase and Lease—CSX Transportation, Inc.*, 6 I.C.C. 2d 799, 825 (1990). We believe that the ICC's interpretation of 49 U.S.C. § 11347 and the labor protections it requires is a permissible one, particularly in light of the policy it seeks to effectuate—the encouragement of line sales to carriers who can operate them profitably.

We also believe that if Congress had intended to force a purchaser in a line sale

---

**6.** Southern had contracted with Illinois Central to hire its employees. WTR has made no such agreement with CSXT and has expressly refused to accept CSXT's CBAs. Brief for Intervenors at 4.

to negotiate with its seller's employees, hire them preferentially, and recognize their preexisting CBAs and bargaining rights, Congress would have done so directly and expressly as it did, for example, in the Regional Rail Reorganization Act of 1973, Pub.L. No. 93–236, 87 Stat. 985 § 502(b) (1973), where it provided:

> [Conrail] shall offer employment, to be effective as of the date of a conveyance or discontinuance of service under the provisions of this Act, to each employee of a railroad in reorganization....

As the Seventh Circuit has expressed this rationale:

> We recognize that Congress has occasionally evinced a desire to bind new operators to existing bargaining agreements of their employees. These acts indicate that where Congress desires successor employers to undertake bargaining obligations of predecessor employers, the intent is explicit and is clearly evident from the pertinent statute itself.

*In re Chicago, M., St. P. & Pac. R.R.*, 658 F.2d 1149, 1175 (7th Cir.1981) (citations omitted), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). Without such a direct expression, we are reluctant to infer congressional intent to abridge an employer's right to make crucial decisions regarding the hiring of its work force. *See Brotherhood of Maintenance of Way Employees v. United States*, 366 U.S. 169, 175 n. 5, 81 S.Ct. 913, 916, 6 L.Ed.2d 206 (1961) (If Congress had intended 49 U.S.C. § 5(2)(f) [the predecessor to section 11347] to require freezing and perpetuation of all jobs in a railroad merger, it would have "specified" this intention).

### III.

For the reasons stated, the petition for review is DENIED, and the decision of the ICC is AFFIRMED.